## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| GABRIEL STEVEN LITTLE DOG, | CV 18-00097-M-JTJ |
| Plaintiff, | |
| vs. | |
| DAVID COOPER, MICHAEL CAREY, JENNIFER ROOT, CHUCK CURRY, FLATHEAD COUNTY, and the FLATHEAD COUNTY SHERIFF'S OFFICE, | ORDER |
| Defendants. | |

Plaintiff Gabriel Little Dog, a prisoner proceeding in forma pauperis and without counsel, filed a Complaint alleging Defendants violated his rights under the First Amendment, the Religious Land Use and Institutionalized Persons Act (RLUIPA) 42 U.S.C. § 2000, et seq., and the American Indian Religious Freedom Act of 1978 ("AIRFA") 42 U.S.C. § 1996.  (Doc. 2.)

Although Mr. Little Dog filed an Amended Complaint on December 6, 2019, it was submitted after the November 9, 2019 amended pleadings deadline line, there was no showing of good cause for its untimeliness, Mr. Little Dog did not file a motion for leave to file an amended complaint as required by Local Rule 15.1, and the amended complaint raises no new claims and provides less factual

1

detail than the original complaint. For these reasons, Defendants motion to strike the amended complaint (Doc. 39) will be granted and the operative complaint for purposes of this Order will be the original complaint (Doc. 2).

Having considered the parties' arguments and submissions, Defendants' Motion for Summary Judgment will be granted on Mr. Little Dog's RLUIPA and AIRFA claims. The Court finds there are genuine disputes as to material facts regarding the merits of Mr. Little Dog's First Amendment claims. The motion for summary judgment will be denied as to those claims.

## I. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Under summary judgment practice, "[t]he moving party initially bears the burden of proving the absence of a genuine issue of material fact." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by showing that such

materials "do not establish the absence or presence of a genuine dispute, or that the adverse party cannot produce admissible evidence to support the fact." Fed.R.Civ.P. 56(c)(1)(A), (B).

"Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *Oracle Corp.*, 627 F.3d at 387 (*citing Celotex*, 477 U.S. at 325); *see also* Fed.R.Civ.P. 56(c)(1)(B). Summary judgment should be entered, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *See Celotex*, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.*

If the moving party meets its initial responsibility, the burden shifts to the opposing party to establish that a genuine issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). To establish

the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. *See* Fed.R.Civ.P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11. "A plaintiff's verified complaint may be considered as an affidavit in opposition to summary judgment if it is based on personal knowledge and sets forth specific facts admissible in evidence." *Lopez v. Smith*, 203 F.3d 1122, 1132 n.14 (9th Cir. 2000) (en banc). The opposing party must demonstrate that the fact in contention is material, i.e., a fact "that might affect the outcome of the suit under the governing law," and that the dispute is genuine, i.e., "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all inferences supported by the evidence in favor of the non-moving party." *Walls v. Cent. Costa Cnty. Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011). It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *See Richards v. Nielsen Freight Lines*, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the

opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586 (citations omitted).

By notice provided on July 12, 2019 (Doc. 67), Mr. Little Dog was advised of the requirements for opposing a motion brought pursuant to Rule 56 of the Federal Rules of Civil Procedure. *See Rand v. Rowland*, 154 F.3d 952, 957 (9th Cir. 1998)(en banc); *Klingele v. Eikenberry*, 849 F.2d 409 (9th Cir. 1988).

## II. FACTS

Mr. Little Dog was arrested on April 18, 2017 in Flathead County, on an arrest warrant for the charges of Assault with a Weapon and Threats in Official Matters. (Statement of Undisputed Facts, Doc. 18 (hereinafter "SUF") at ¶ 1.) In the Affidavit of Probable Cause, the arresting officer noted that Laurie Covarrubias reported being assaulted multiple times throughout the day by Mr. Little Dog and that he had threatened her with a knife. (SUF at ¶ 2.) After Mr. Little Dog was arrested, he threatened to kill the arresting officers and their families. (SUF at ¶ 3.)

Almost immediately on arrival at the Flathead County Detention Center ("FCDC"), Mr. Little Dog had behavioral issues. (SUF at ¶ 4.) In one incident on May 15, 2017, Mr. Little Dog was being rehoused by Officer Guffin as a result of prior threats of harm to jail staff and spitting. (SUF at ¶ 5.) According to an unsigned May 15, 2017 incident report, while being rehoused, Mr. Little Dog saw

Chief Cooper, turned and looked at him, formed his hand into a gun shape, and said "boom, mother *#$@*#." (SUF at ¶6; Doc. 18-1 at 9.) After that statement, he continued to threaten staff and use offensive language to staff. (SUF at ¶ 7.)

Jennifer Root has been the FCDC detention commander for four years. (SUF at ¶ 8.) On May 22, 2017, she disciplined Mr. Little Dog for having a homemade "shank" in his cell and for threatening staff. (SUF at ¶ 9.) Based on his continued threatening behavior, Mr. Little Dog was classified as a safety risk. (SUF at ¶ 10.)

Mr. Little Dog frequently used the grievance procedures and the kite system to complain about numerous issues, including his perception that he received less TV time than other inmates and had phone privileges restricted. (SUF at ¶ 11.) When Commander Root tried to speak to Mr. Little Dog about his behavior, he called her derogatory and offensive names, and he refused to discuss the issues or attempt to come to any resolution. (SUF at ¶ 12.)

Mr. Little Dog had continuing outbursts and behavioral issues throughout the summer of 2017 while incarcerated in the FCDC. (SUF at ¶ 13.) Based on his continued behavioral issues, including threatening the safety of jail staff, Mr. Little Dog was routinely classified as a maximum-security risk and was viewed as a potential safety risk by jail staff. (SUF at ¶ 14.)

On May 10, 2017, shortly after Mr. Little Dog was initially booked into the FCDC, he received a visit from Laurie Covarrubias, who attempted to drop off a bandanna containing what appeared to be a variety of twigs and unknown plants or herbs. (SUF at ¶ 15.)

David Cooper has been the FCDC chief detention officer for eight years. Ms. Covarrubias portrayed herself to Officer Cooper as a tribal advocate working with Native American inmates on religious issues. (SUF at ¶ 17.) Ms. Covarrubias did not advise Officer Cooper that she was Mr. Little Dog's girlfriend, nor did she advise Officer Cooper that she was the victim of the assault charge for which Mr. Little Dog was being held. (SUF at ¶ 18.)

After Ms. Covarrubias's non-contact visit began, Officer Cooper learned that she was the victim of the crime alleged against Mr. Little Dog. (SUF at ¶ 19.) Officer Cooper explained to Ms. Covarrubias that he could not allow the bandanna with the substances to go to Mr. Little Dog, as she was the victim in the case, not a tribal advocate or representative, and the jail could not verify the substances. (SUF at ¶ 20.)

Officer Cooper also explained this to Mr. Little Dog, in a letter memo incorrectly dated as March 12, 2017, but actually sent on May 12, 2017. (SUF at ¶ 21.) Officer Cooper offered different alternatives to the bandanna provided by

Ms. Covarrubias, including having an elder send in a medicine bag or finding a medicine bag from an online source.  (SUF at ¶ 22.)  Mr. Little contends that in his "1st Nations way any one can bring them for use, regardless of this misinformed interpretation."  He also contends it is sacrilege to purchase sacred items.  (MSJ Response, Doc. 36 at 2.)

Officer Cooper also tried to speak in person with Mr. Little Dog.  (SUF at ¶ 23.)  However, every time Officer Cooper tried to talk with Mr. Little Dog, Mr. Little Dog got very verbally abusive, and yelled and swore at Officer Cooper. (SUF at ¶ 24.)

On September 20, 2017, Mr. Little Dog was released to transport to Galen State Hospital.[1]  (SUF at ¶ 25.)  While at Galen, Mr. Little Dog was allowed to smudge in an attached out-door recreation area two to three times a week and was allowed to wear his medicine bag daily.  (MSJ Response, Doc. 36 at 2.)[2]

On November 21, 2017, after Mr. Little Dog returned from Galen, he filed a grievance asking for his medicine bag and to be allowed to smudge.  (SUF at ¶ 28.) Mr. Little Dog was instructed that his request had to first be made via kite to

---

[1] For purposes of this Order, the Court will assume that when the parties refer to the "Galen" they are referring to the Forensic Mental Health Facility in Galen, Montana.

[2] For purposes of this Order, the Court will assume that the medicine bag Mr. Little Dog was allowed to wear at Galen was a different medicine bag than the one brought to the jail by Ms. Covarrubias.

Officer Cooper for approval prior to filing a grievance.  On November 23, 2017,

Mr. Little Dog sent a kite to Officer Cooper, asking the location of the smudge,

medicine bag, and red bandana Ms. Covarrubias had left for him in May 2017.

(SUF at ¶ 29; Doc. 18-1 at 68.)  Officer Root responded that the religious items

were in a sealed bag in his office, where they had been since May 2017, when Ms.

Covarrubias dropped them off.  (SUF at ¶ 31.)  Officer Cooper had asked Ms.

Covarrubias to pick them up, but she had not done so.  (SUF at ¶ 32.)

On December 10, 2017, Mr. Little Dog sent a kite to Commander Root and

Officer Cooper complaining that he had the right to smudge under RLUIPA.  Even

though Mr. Little Dog did not mention a medicine bag in this request, the response

from Officer Cooper was, "If you have a medicine bag sent in from a bonafide

medicine man, you will have one . . . Or I can order you one from Amazon."  (Doc.

18-1 at 70.)

On December 12, 2017, Mr. Little Dog sent another kite stating, "I have

them here already, in the property brought up from Galen."  On December 15,

2017, Officer Cooper replied, "I will talk with the Commander on Monday when

she returns to work and see about you being allowed to have the medicine bag that

was dropped to you in Galen."  (Doc. 18-1 at 71.)

On December 29, 2017, Mr. Little Dog complained that he was being

prohibited from his Native religious practices, i.e., smudging and wearing his medicine bag. He requested that he be allowed to, "wear my medicine bag, and allowed to smudge in the rec. area." On December 20, 2017, Sgt. McGilvary responded, "that would have to be approved by the Chief or Commander." (Doc. 36-1 at 4.)

On January 4, 2018, Mr. Little Dog again filed a grievance asking to be allowed his Native religious practice of smudging in the recreation area and to wear his medicine bag. (Doc. 36-1 at 6.) Officer Cooper responded on January 10, 2018, stating, "Not authorized, per the sheriff. Future grievances regarding this issue will not be processed." (Doc. 36-1 at 6.)

On January 5, 2018, Mr. Little Dog filed another grievance stating he was being denied his Native religious practice and object (medicine bag). On January 10, 2018, Officer Cooper responded, "Sheriff will not authorize." (Doc. 36-1 at 7.)

On March 6, 2018, Mr. Little Dog filed another grievance asking to be allowed to wear his medicine bag and to smudge in the recreation area. It was denied by ACDO Carey stating, "This issue has already been addressed and denied in the past. No further grievances on this issue will be addressed." (Doc. 36-1 at 16.)

On March 25, 2018, Mr. Little Dog filed yet another grievance asking to

smudge in the recreation area and to wear his religious necklace—medicine bag. On March 26, 2018, ACDO Carey responded stating, "This grievance has been exhausted. You have been told that further grievances on this issue will not be accepted." (Doc. 36-1 at 12.) Mr. Little Dog appealed this grievance.

On March 15, 2018, Mr. Little Dog filed a grievance stating that he was now DOC and requested to smudge under state law. Officer Cooper responded on March 16, 2018 stating, "Request denied." (Doc. 36-1 at 21.)

Mr. Little Dog filed additional kites and/or grievances on March 8, 2018, March 14, 2018, March 25, 2018, and March 26, 2018 on the same issue which were denied as already having been addressed. (Doc. 36-1 at 13-15, 16-20.)

Defendants contend Mr. Little Dog continued to refuse to acknowledge or consider the alternatives offered by Officer Cooper, and instead continued to grieve the issue. (SUF at ¶ 32.) Mr. Little Dog contends no alternatives were presented to him. He states Officer Cooper told his wife that they would take a picture of his sacred objects that he could tape to his cell wall. (MSJ Response, Doc. 36 at 2-3.)

Mr. Little Dog also asked permission to smudge. (SUF at ¶ 38.) The FCDC does not allow the use of any flammable materials in the facility for safety purposes, including the inhalation of smoke, the potential for damage to the

11

facility, and the well-being of staff and inmates. (SUF at ¶¶ 39-41; Cooper Aff, Doc. 18-2 at 4, ¶ 17.) The FCDC does not possess sufficient resources to provide one-on-one supervision to inmates who wish to use flammable materials. (SUF at ¶ 43.) Because the release of smoke poses a health risk, the FCDC does not allow any form of religious worship that results in the release of smoke indoors. (SUF at ¶ 43.)

Mr. Little Dog never asked to smudge indoors. He did ask to smudge in the outdoor recreation area as he did in Galen. (MSJ Response, Doc. 36 at 3.)

Officer Cooper wanted to speak with Mr. Little Dog to determine if there was some form of alternative to the use of fire for his smudging ceremony, including being provided ash from burnt herbs to purify his living space but he could not have any such discussion because Mr. Little Dog continued to act aggressively toward Officer Cooper and other jail staff. (SUF at ¶¶ 44-46; Doc. 18-2 Aff. Cooper at ¶ 18.)

## III. ANALYSIS

### A. RLUIPA

RLUIPA provides that "no government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution" unless the government shows that the burden furthers "a compelling government interest"

by "the least intrusive means" available. 42 U.S.C. § 2000cc-1(a).

RLUIPA does not authorize money damages against state officials, regardless of whether they are sued in their official or individual capacities. *See Jones v. Williams*, 791 F.3d 1023, 1031 (9th Cir. 2015). The only relief Mr. Little Dog may obtain under RLUIPA is injunctive relief but since his is now incarcerated at Montana State Prison, his claims for injunctive relief are moot. *Id.* (finding plaintiff's claims for injunctive relief pursuant to RLUIPA moot because plaintiff had been released from custody); *see also Preiser v. Newkirk*, 422 U.S. 395, 402-03 (1975); *Johnson v. Moore*, 948 F.2d 517, 519 (9th Cir. 1991) (per curiam); *see also Andrews v. Cervantes*, 493 F.3d 1047, 1053 n.5 (9th Cir. 2007).

Mr. Little Dog's claims under RLUIPA will be dismissed.

## B. AIRFA

Mr. Little Dog lists his alleged violations under both the Protection and Preservation of Traditional Religions of Native Americans Act (42 U.S.C. § 1996) and the American Indian Religious Freedom Act but they are the same statute. "The AIRFA is a joint resolution of Congress that establishes the 'policy of the United States to protect and preserve for American Indians their inherent right of freedom to believe, express, and exercise [their] traditional religions . . . , including but not limited to access to sites, use and possession of sacred objects, and the

freedom to worship through ceremonials and traditional rites.' " *Henderson v. Terhune*, 379 F.3d 709, 715 (9th Cir. 2004) (citing 42 U.S.C. § 1996).

The Supreme Court has held that the AIRFA is simply a policy statement that is judicially unenforceable. *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 455 (1988). Accordingly, Mr. Little Dog cannot state a claim under the AIRFA. These claims will be dismissed.

## C.    First Amendment

The First Amendment prohibits the government from making a law prohibiting the free exercise of religion. "The right to exercise religious practices and beliefs does not terminate at the prison door. The free exercise right, however, is necessarily limited by the fact of incarceration, and may be curtailed in order to achieve legitimate correctional goals or to maintain prison security." *McElyea v. Babbit*, 833 F.2d 196, 197 (9th Cir. 1987) (per curiam). In asserting a free exercise claim, an inmate must demonstrate that the "government action in question substantially burdens the person's practice of her religion." *Jones v. Williams*, 791 F.3d 1023, 1031 (9th Cir. 2015) (citation omitted). This is "more than an inconvenience," and "must have a tendency to coerce individuals into acting contrary to their religious beliefs or exert substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Id*. at 1031-32 (citation omitted).

14

An inmate's First Amendment free exercise claims must be analyzed under *Turner v. Safley*, which holds that prison restrictions will be upheld as long as they are "reasonably related to legitimate penological interests." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987) (*citing Turner v. Safley*, 482 U.S. 78, 89 (1987)); *see also Jones*, 791 F.3d at 1032 (citations omitted). "This approach ensures the ability of corrections officials 'to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration,' and avoids unnecessary intrusion of the judiciary into problems particularly ill suited to 'resolution by decree.'" *Id.* (*quoting Procunier v. Martinez*, 416 U.S. 396, 405 (1974), *limited by Thornburgh v. Abbott*, 490 U.S. 401 (1989), and *citing Turner*, 482 U.S. at 89, *Bell v. Wolfish*, 441 U.S.520, 548 (1979)).

The factors *Turner* cited as relevant to the inquiry of whether the restrictions are reasonably related to legitimate penological interests are: (1) a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) "whether there are alternative means of exercising the right that remain open to inmates"; (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) the "absence of ready alternatives" and the "existence of obvious, easy alternatives." *Turner*, 482 U.S. at 89-91.

Mr. Little Dog alleges Defendants violated his rights when they would not allow him to use his medicine bag and when they refused to allow him to smudge. Defendants do not dispute that Mr. Little Dog's claims involve sincerely held religious beliefs consistent with his faith. They do dispute that the denial of the medicine bag substantially burdened Mr. Little Dog's practice of his religion and they contend all four of the *Turner* factors weigh in favor of the Defendants on the medicine bag issue. They also contend that three of the *Turner* factors weigh in their favor on the smudge issue.

> **1.** **Is there a valid, rational connection between the restrictions at issue and the proffered government interests put forward to justify the restriction?**

Legitimate penological interests include "the preservation of internal order and discipline, the maintenance of institutional security against escape or unauthorized entry, and the rehabilitation of prisoners." *Procunier*, 416 U.S. 396, 412 (1974) (footnote omitted).

> The Supreme Court has repeatedly emphasized that, in determining the validity of regulations impinging on the constitutional rights of inmates, courts are to accord great deference to prison officials' assessments of their interests. Nevertheless, deference does not mean abdication. Prison officials must "put forward" a legitimate governmental interest to justify their regulation and must provide evidence that the interest proffered is the reason why the regulation was adopted or enforced. The Constitution requires that considerations advanced to support a restrictive policy be directly implicated by the protected activity, and sufficiently articulated to

16

permit meaningful constitutional review." Caldwell v. Miller, 790 F.2d 895, 599 (7th Cir. 1986). It is only after prison officials have put forth such evidence that courts defer to the officials' judgment. (internal citations and quotations omitted)

*Walker v. Sumner*, 917 F.2d 382, 396 (9th Cir. 1990); *see also Ashker v. Cal. Dep't of Corr.*, 350 F.3d 917, 922 (9th Cir. 2003); *Prison Legal News v. Cook*, 238 F.3d 1145, 1150 (9th Cir. 2001). "Prison authorities cannot rely on general or conclusory assertions to support their policies. Rather, they must first identify the specific penological interests involved and then demonstrate both that those specific interests are the actual bases for their policies and that the policies are reasonably related to the furtherance of the identified interests." *Walker*, 917 F.2d at 386.

### a. Medicine Bag

Defendants assert there is a rational connection between the denial of Mr. Little Dog's medicine bag and the legitimate governmental interest in jail safety. The proffered justification for not allowing the medicine bag into the jail was that FCDC could not verify the materials in the bandanna dropped off by Ms. Covarrubias and because Ms. Covarrubias was the victim in Mr. Little Dog's criminal case. (SUF at ¶ 20; Cooper Aff., Doc. 18-2 at ¶¶ 9, 10,15.)[3]

---

[3] Defendants also submitted that Ms. Covarrubias was not a trial advocate or representative but produce no evidence to support this statement.

Defendants did not put forth evidence of the legitimate governmental interest justifying the decision to not give Mr. Little Dog his medicine bag. That is neither Commander Root nor Officer Cooper testified that the security of the jail was dependent on controlling the flow of materials into the jail. Defendants argued and cited a District of Arizona case for the proposition that a facility has "a compelling security interest in controlling and monitoring the flow of materials in and out of the prison." *Jonas v. Schriro,* No. CV 04-2719-PHX-SMM (MEA), 2006 U.S. Dist. LEXIS 69427, at *14 (D. Ariz. Sept. 25, 2006). While there was no evidence on this issue, it is hard to imagine that a jail does not have a compelling interest in controlling and monitoring the flow of materials in and out of the building. But again, there is a lack of evidence on this issue.

Regardless, on December 12, 2017, Mr. Little Dog asked for the medicine bag that was in his property that had been brought back from Galen. (December 12, 2017 Kite, Doc. 18-1 at 71; see also November 21, 2017 Booking Sheet listing property, Doc. 18-1 at 34.) Mr. Little Dog had been allowed to wear this medicine bag daily while in Galen. (Doc. 36 at 2.) On December 15, 2017, Officer Cooper responded that he would talk to Commander Root about whether Mr. Little Dog would be allowed to have the medicine bag that was in his property from Galen. (December 12, 2017 Kite, Doc. 18-1 at 39.) There is no indication in the record

that Mr. Little Dog was ever allowed this medicine bag either and it seems like a reasonable inference that he was not because he continued to grieve the issue until at least March 2018.

Defendants provided no evidence or explanation regarding why Mr. Little Dog was not allowed to have the medicine bag in his property that he had been allowed to use on a daily basis in Galen. Defendants contend that the Montana State Hospital in Galen is a public psychiatric hospital which provides inpatient psychiatric treatment for adults with serious mental illness. (SUF at ¶ 26.) They argue, albeit with regard to smudging, that "Galen is a non-penological psychiatric prison, which does not necessarily pose the same safety and security risks that a jail, which houses persons accused of crimes, does." (MSJ Brief at 13.)

Without further evidence, the Court cannot agree. To the contrary, the Forensic Mental Health Facility in Galen serves a number of different commitment types including individuals committed to a mental health facility for evaluation of fitness to proceed pursuant to Mont. Code Ann. § 46-14-202(2) through 206; individuals committed to the custody of the Director of the Department of Public Health and Human Services to be placed for treatment to restore fitness to proceed pursuant to Mont. Code Ann. §46-14-221; individuals admitted to FMHF under a court order for a mental health evaluation to be included in a pre-sentence

investigation under Mont. Code Ann. § 46-14-311(2); individuals committed to the custody of the Director of the Department of Public Health and Human Services to be placed for custody, care, and treatment under Mont. Code Ann. § 46-14-301; individuals committed to the custody of the Director of the Department of Public Health and Human Services to be placed for custody, care, and treatment under Mont. Code Ann. § 46-14-312; individuals in the custody of the Department of Corrections and transferred to the FMHF under Mont. Code Ann. § 53-21-130, or accepted for voluntary admission following such a transfer under Mont. Code Ann. § 53-21-111; and individuals involuntarily committed to MSH under Mont. Code Ann. § 53-21-127, while serving a sentence at a correctional facility. Montana State Hospital Forensic Mental Health Facility Policy and Procedure Admission Criteria for the Forensic Mental Health Facility Policy: MSH FMHF-01. https://dphhs.mt.gov/amdd/MSH/forensicmentalhealthfacility. The Galen campus is for patients who come to the state hospital through criminal, not civil commitments. It could be argued that the combination of both mental health issues and criminal issues poses even greater safety and security issues than those in a jail.

Regardless, there is no evidence or discussion why Mr. Little Dog was not allowed his medicine bag which was in his property from Galen. Defendants

failed to meet their burden as the party moving for summary judgment as to the first prong of the *Turner* analysis. Defendants failed to submit any evidence demonstrating a legitimate government interest justifying the denial of the medicine bag which Mr. Little Dog used on a daily basis which held at the Forensic Mental Health Facility in Galen from September 20, 2017 through November 21, 2017.

### b. Smudge

There is also a genuine issue of material fact regarding whether there was a legitimate governmental interest justifying the denial of Mr. Little Dog's request to smudge in the outdoor recreation area. The only evidence provided by Defendants regarding Mr. Little Dog's request to smudge was that it would not be safe to allow flammable materials inside the jail facility. The prohibition of flammable materials inside the jail building would seem to be based on legitimate penological reasons of safety and well-being of inmates and guards. But Mr. Little Dog requested to smudge in the outdoor recreation area. (MSJ Response Doc. 36 at p. 3; December 9, 2017 Grievance Doc. 36-1 at 4; January 4, 2018 Grievance Doc. 36-1 at 6; March 6, 2018 Grievance Doc. 36-1 at 16; March 25, 2018 Grievance

Doc. 36-1 at 12.)[4]

Defendants provided no justification for not allowing Mr. Little Dog to smudge outdoors. There is a genuine issue of material fact regarding whether Defendants can satisfy the first requirement of the *Turner* test with regard to allowing Mr. Little Dog to smudge outdoors. They have not shown a valid, rational connection between their policies of not allowing Mr. Little Dog to smudge and a legitimate governmental interest.

As such, on the present record, there is a genuine issue of material fact on the first requirement of the *Turner* test with regard to Mr. Little Dog's request for his medicine bag and to smudge. Defendants have not adequately shown a valid, rational connection between their policies and a legitimate governmental interest. A regulation cannot be sustained where the logical connection between the regulation and the asserted goal has not been demonstrated and the legitimacy and

---

[4] Defendants argue that Mr. Little Dog's evidence (Doc. 36-1) constitutes inadmissible hearsay and should not be considered. The Court agrees that only admissible evidence may be considered in ruling on a motion for summary judgment. *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002); *see also* Fed. R. Civ. P. 56(e). In determining admissibility for summary judgment purposes, however, it is the contents of the evidence rather than its form that must be considered. *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003). If the contents of the evidence could be presented in an admissible form at trial, those contents may be considered on summary judgment even if the evidence itself is hearsay. *Id.* (affirming consideration of hearsay contents of plaintiff's diary at summary judgment because at trial, plaintiff's testimony of contents would not be hearsay). Except for a one-page letter regarding a grievance filed at the Montana State Hospital, all the documents attached to Mr. Little Dog's response are grievances from FCDC. These documents could be presented in an admissible form at trial through the testimony at trial of Mr. Little Dog and Defendants. The Court will consider these exhibits.

neutrality of the governmental objective has not been shown. *Turner*, 482 U.S. at 89–90. Because the first *Turner* factor "'constitutes sine qua non,'" a court need not reach the remaining three factors if the regulation at issue is not rationally related to a legitimate and neutral governmental objective. *Prison Legal News v. Lehman*, 397 F.3d 692, 699 (9th Cir.2005). However, the Court will address them briefly.

### 2. Did alternative means of exercising the rights remain open to Mr. Little Dog?

Under this factor, "[t]he relevant inquiry . . . is not whether the inmate has an alternative means of engaging in the particular religious practice that he or she claims is being affected; rather, [the court must] determine whether the inmates have been denied all means of religious expression." *Ward v. Walsh*, 1 F.3d 873, 877 (9th Cir. 1993) (*citing O'Lone*, 482 U.S. at 351–52); *see also Mayweathers v. Newland*, 258 F.3d 930, 938 (9th Cir. 2001).

The Court agrees that Defendants offered Mr. Little Dog other means by which to have a medicine bag at the FCDC. He could have had a "bona-fide Tribal Elder" send him a medicine bag. (Doc. 18-2 at 6.) Mr. Little Dog does not dispute that this option was available or why it was not a viable option for him. He argues that in his "1st Nations way anyone can bring them for use" (Doc. 36 at 2) but that only buttresses Defendants' arguments. If anyone could bring them for

use, then it seems possible that a Tribal Elder could provide a medicine bag for Mr. Little Dog.  Officer Cooper also told Mr. Little Dog that he could have had a medicine bag sent in from an online source and if he could not afford one, FCDC would purchase one for him.  (Doc. 18-2 at 6.)  Mr. Little Dog contends it would be sacrilege to purchase sacred items.  (MSJ Response, Doc. 36 at 2.)

Mr. Little Dog was not denied access to all medicine bags, just the medicine bag dropped off by Ms. Covarrubias and presumably the medicine bag he had used at Galen.  Because he was offered other means by which to get a medicine bag, he was not deprived of all means of religious expression.  Consequently, it appears that the second *Turner* factor weighs in Defendants' favor with regard to the medicine bag.

Defendants admit no alternative means of exercising the right to smudge under the policies of the FCDC were available, although Commander Root contends they would have discussed alternatives but Mr. Little Dog was not willing to do so.  This factor appears to weigh in favor of Mr. Little Dog

**3.    What impact would allowing a medicine bag or smudging have on guards and other inmates, and on the allocation of prison resources?**

Under the third prong of the *Turner* test the court must consider the impact the accommodation would have on guards and other inmates and on the allocation

of prison resources generally.  With regard to the medicine bag, Defendants contend the third *Turner* factor weighs in their favor because allowing potentially dangerous substances in the jail would be significant to guards and other inmates, as it would potentially allow contraband to flow into the jail without monitoring.

But again, Defendants submitted only argument and no evidence in support of their contentions regarding both the medicine bag and smudge and therefore fail to meet their burden as to the third prong of the *Turner* analysis.  The Court can foresee that allowing unknown substances into the jail could have a significant impact on guards and the allocation of prison resources.  But again, there is no explanation regarding why allowing Mr. Little Dog to have a medicine bag acceptable by the Forensic Mental Health Unit in Galen would significantly impact guards or other inmates or the allocation of prison resources.

Similarly, there is insufficient evidence to establish that an outdoor smudge would have a significant impact on the guards, other inmates, and on the allocation of prison resources.  Defendants presented evidence that allowing inmates within the facility to have flammable materials indoors would have a significant impact on guards and other inmates but that is not what Mr. Little Dog was asking for.  He requested an outdoor smudge.  This factor appears to weigh in favor of Mr. Little Dog.

4. **Is the absence of ready alternatives evidence of the reasonableness of the prohibition on Mr. Little Dog's medicine bag or are there obvious alternatives that evidence an exaggerated response?**

Finally, the fourth *Turner* factor requires the court to consider whether there are ready alternatives to the prison's current policy that would have accommodated Mr. Little Dog at a de minimus cost to the prison. The "existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." *Turner*, 482 U.S. at 90. Prison officials do not bear the burden of disproving the availability of alternatives. *See O'Lone*, 482 U.S. at 350.

Allowing Mr. Little Dog to have the medicine bag from Galen seems to be an obvious, easy alternative. An obvious alternative to allowing indoor smudge would be allowing outdoor smudge as sought by Mr. Little Dog. The fourth *Turner* factor also appears to weigh in favor of Mr. Little Dog.

## IV. CONCLUSION

For the reasons set forth above, the Court will grant Defendants' Motion for Summary Judgment on Mr. Little Dog's RLUIPA and AIRFA claims. Having considered the parties' arguments and submissions, the Court finds there are genuine disputes as to material facts regarding the merits of Mr. Little Dog's First Amendment claims. The motion for summary judgment will be denied as to those

claims.

Based upon the foregoing, the Court issues the following:

## ORDER

1. Defendants' Motion for Summary Judgment (Doc. 16) is GRANTED with regard to Mr. Little Dog's Claims under RLUIPA and AIRFA and those claims are DISMISSED.

2. Defendants' Motion for Summary Judgment (Doc. 16) is DENIED with regard to Mr. Little Dog's First Amendment claims.

3. Defendants' Motion To Strike Amended Complaint (Doc. 39) is GRANTED.  Mr. Little Dog's Amended Complaint filed December 6, 2019 (Doc. 38) is STRICKEN.

DATED this 21st day of January, 2020.

        */s/ John Johnston*
        John Johnston
        United States Magistrate Judge